Did you save time for rebuttal? I did, Your Honor. I saved five minutes. Okay. Thank you. Good morning, Your Honors. My name is Marilyn Murray. I'm an assistant district attorney in Philadelphia County, and I represent the appellate respondents or the Commonwealth of Pennsylvania. Preliminarily, I would like to point out that the conflict claim here was defaulted. The district court found the PCRA time bar inadequate under Bronstein, and the Commonwealth recognizes that this panel is bound by Bronstein. The Commonwealth did preserve the default issue for possible en banc review or Supreme Court review in their brief at page 32, note 21. I would just like to point out that in Beard v. Kindler, argued before the United States Supreme Court on November 2nd of this year, that case involves the adequacy of Pennsylvania's fugitive forfeiture rule. There Kindler has argued that the rule is inadequate because of the history of relaxed waiver in capital cases in Pennsylvania. It's possible that Kindler might address the impact of relaxed waiver on adequacy of state rules in capital cases in Pennsylvania, and it could conceivably render the time bar inadequate rule. I just wanted to note that case that is now before the United States Supreme Court. Now first of all, Petitioner Calvin Morris was not entitled to a federal evidentiary hearing. Section 2254E2 of the federal habeas statute prohibits evidentiary hearings where the petitioner was not diligent in developing the record in support of his claim, his or her claim. Help me with that, because that doesn't seem to be what the structure of the section suggests. You, and the Wilson case points this out, this section starts out, if the applicant has failed to develop the factual basis of a claim in the state court proceeding, district court won't hold a hearing except, and then it has two exceptions. And in Wilson v. Beard, the district court, Judge Becker said, quote, if a petitioner requests a hearing to develop the record on a claim in the state court, and if the state court deny, state courts deny that request on the basis of an inadequate state ground, the petitioner has not, inside quote, failed to develop the factual basis of the claim in the state court proceedings, end of inside quote, for the purposes of section 2254E2. So it seems to me that we are, our attention has already been focused by Wilson v. Beard on the first clause, and can we say that there was a failure to develop the factual basis when he tendered the claim and the factual basis to the state court and was denied on the ground, on an inadequate state court ground? Well, Your Honor, first of all, I would note that Wilson is distinguishable in that it involved new evidence that was not previously available to Wilson. It was the McMahon tape that was released in 1997. So it's unusual factually, but subsequent decisions of this court have indicated that asking for an evidentiary hearing on a time-barred claim is not enough. There's still a requirement of diligence. Taylor v. Horn, cited in our brief, rejected the petitioner's claim that he was entitled to a federal evidentiary hearing because the PCRA court denied a hearing on an inadequate rule. There it was, the PCRA time-bar. Requesting hearing is simply not enough. There were also, and here, petitioner knew about this conflict prior to trial. His whole family knew about the joint representation, and he failed to raise the claim at trial in post-verdict motions when he was represented by two different attorneys, on direct appeal when he was represented by yet another attorney, and also on first PCRA review when he was represented by another attorney. All of those attorneys could have learned about the conflict by simply interviewing petitioner, his mother, or other family members. There are two recent cases decided over the summer, subsequent to the briefing. One is Boyd v. Weymart at 579 Fed 3, 330. There, this court en banc remanded to the district court for an initial determination as to whether 2254E2 barred an evidentiary hearing there. There, the magistrate had had an evidentiary hearing without considering 2254E2. Speaking of that, what is the standard of review here? It seems that the 11th Circuit says it's clear error. What's your position? In terms of the standard review for determining diligence under 2254E2. I think it's plenary review. It's clear error, but you would review the district court. I think your review is plenary on matters of law. And in a dissent in the Boyd case, I would point out in a dissenting opinion by Judge Hardiman and Judge Garrett and Judge Jordan, that dissenting opinion observed that merely requesting and being denied a hearing is not enough under 2254E2. Boyd was required to proffer evidence and argument in support of his claims. And as to both prongs of his ineffectiveness claim there. The court also noted that there, Boyd knew about his claim at the time of his plea and sentencing, and yet he waited and did not develop it. The other case is Lewis v. Horn. That's a capital case, 581 Fed Third 92. And there again, a panel of this court squarely held that merely requesting a hearing is not sufficient diligence. The court held that Lewis was not entitled to a federal evidentiary hearing on most of his claims because he had failed to make an adequate proffer in state court. Now what's interesting there is one of the claims that Lewis failed to develop was a claim of ineffectiveness at the guilt phase. And those claims were found to be waived in state court, and the federal court found that waiver inadequate. The court nonetheless held that the denial of the claim based on an inadequate procedural rule didn't absolve Lewis of the duty to diligently develop the facts. Now here, Petitioner knew about this conflict pretrial, but not only did he wait over a decade to raise the claim, but when he finally did raise the claim, in support of the claim, he merely proffered letters written by counsel several months before his trial, as well as a deposition taken about a year after trial. That proffer alone did not establish dual representation at the time of trial, nor did it establish adverse effect. I submit that an evidentiary hearing is barred under AEDPA, and as the district court correctly concluded, release cannot be granted without an evidentiary hearing. Now my second point is that Petitioner waived the conflict. The waiver has to be knowing, intelligent, voluntary, right? Correct, Your Honor. If I remember the verbiage from the cases, it's intentional relinquishment of a known right. Is that right? That's correct, Your Honor. Do you agree with that formulation? That's correct. Where in the record do you see that Kelvin Moore has intentionally relinquished the right to have his criminal defense lawyer also representing a man who might have been guilty of the homicide? Well, Your Honor, it's because Petitioner never raised the claim and elected not to testify at the evidentiary hearing, all that is available is trial counsel's testimony. Right. So the strength of your argument regarding the impropriety of the evidentiary hearing, it seems to me, evidences your lack of any real argument on waiver, right? You're saying, well, they didn't raise this, lo, those many years ago. They waited way too long, 11 plus years, and as a result, there really isn't any evidence in this record that there was a true waiver here, is there? Well, there's no question that the waiver cannot be established without an evidentiary hearing. I would simply point out that the Fifth Circuit has developed a test for establishing a waiver when the state court record is silent as to a waiver of a conflict, and that is evidence that the Petitioner was aware of the conflict, he realized the consequences to his defense of the conflict, and he was aware of the right to other counsel. All right. So if Judge Tucker had testified at the evidentiary hearing that, look, I knew about this conflict, this was a serious matter, I sat Kelvin and Artie down together in a room, I explained all the details of this, and they both agreed to waive the conflict, that might get you over the hurdle. But as I read Judge Tucker's testimony, it was a lot more equivocal than that. It was along the lines of, well, I'm sure we would have covered that, and in fact, he even indicated error. He said, well, we did things differently back in 82 and 83, and that was, in fact, incorrect, was it not? I think what he was referring to, I'm not quite sure what he was referring to there, but I believe he did clearly state that Kelvin Morris, the Petitioner, knew about the conflict, as did his brother Artie Morris, that he discussed this at great length with him. Well, he knew about the dual representation, but isn't that different from explaining in the sort of detail that is required in order to satisfy the high threshold for intentional relinquishment of a known right? Well, that's certainly correct, Your Honor. There's a big difference between being aware of dual representation and really understanding a conflict of interest. However, I would point out that by the time counsel testified, it was 20 years after the events occurred, and he also no longer had the benefit of his file, so he could not recall specifically what he told the Petitioner about the conflict, but he knew he discussed it fully with him, and he wanted his counsel to continue to represent him as well as his brother. Didn't the district court find as a fact that counsel did not appreciate, did not understand that there was a conflict because he didn't regard this alternative as a plausible strategy? And therefore, he said it's fair to assume that there was no explanation to Kelvin so that he could know what was in his best interest. Well, Your Honor, I know what you're referring to. The court thought that trial counsel didn't appreciate the conflict based on his testimony, solely on his testimony, that he wouldn't have continued the representation if he really felt it would have an adverse effect on his client. But that candid statement that he didn't think the conflict would have an adverse effect on his client is not the same thing as not appreciating the conflict. He candidly admitted that there was a conflict, and he fully discussed it with Petitioner. I might also point out that there's – it's kind of an old case, but it's United States v. Laura, a case from this circuit. I mean, it differs from this case in respects that the conflict came to the fore prior to what ultimately became a plea on the part of Laura. So there is greater factual development, certainly, than there was here, where nothing's said about a conflict until 20 years later. But there, neither counsel nor Laura perceived a conflict. They gave affidavits to the court saying that they didn't see a conflict. The trial court did not colloquy the defendant. It was counsel that did. And counsel didn't address the dangers of the conflict in the colloquy. Laura also said that she was being represented by the same attorney as her husband, and her husband was paying for counsel. And she said she couldn't afford another attorney, and she wasn't told that she had the right to a court-appointed attorney. Nonetheless, this court found the waiver valid, despite her subsequent testimony that nobody ever explained the conflict to her. Now, this court found Laura's failure to raise the conflict until after she had another conviction and her probationary sentence was going to be revoked significant. Here, Morris didn't complain about this conflict until after his brother already died. And the district court found that fact curious. I submit to the court that under Laura, it's significant. I also would note that Petitioner was well aware of the right to appointed counsel if his attorney withdrew. Prior to Judge Tucker representing Petitioner, he was represented by Suzanne Urkel, and she became ill during jury selection. She was ready to go. She was taking a jury, and she got sick. So the case got continued and new counsel was appointed. So he was aware that counsel was appointed there right on the eve of trial, and he also post-trial filed a pro se motion for appointment of new counsel. So I think he knew about the right to appointment of counsel. In any event, thirdly, Petitioner failed to prove his conflict claim. To prove a conflict claim, a defendant who raised no objection in trial – I'm sorry. Can I interrupt you? Before you move on to your third point, you just said, I think he knew. I think it's clear that he knew based on that. But once again, under this court's precedence, it's not all that clear that he has to know about the right to appoint counsel. Know what exactly? That he could have another attorney if his attorney withdrew based on the conflict. Can you refer – let's go back a minute to an earlier question. I think you were asked earlier, can you give us a record site that would indicate that Tucker discussed not merely the dual representation, but discussed the possibility of involving Ardy? He testified that he discussed with Kelvin the possibility of involving Ardy. I believe he did, and I know he indicated that he told Ardy – he asked Ardy if he would be concerned if he mentioned Ardy possibly did it or something of that nature. I believe he was clear on that. It sets forth in a brief, he clearly discussed the conflict with Petitioner. Dual representation, you mean? Both dual representation and the conflict. What he couldn't remember was specifically what he said, because it was over 20 years later and he didn't have his trial file anymore. Right. So how do you – you have the burden. If he can't specifically recall what he said, how could the trial court in this case, whose opinion and order we're reviewing, have erred as a factual matter in concluding that there was not a valid waiver here? Well, on that note, the trial court concluded that the state had the burden. Arguably, we did not, given the delay. There are two Supreme Court cases suggesting that in the case of an uncounseled conviction, when a petitioner attacks an uncounseled conviction collaterally, the burden should be on the petitioner, not on the state. Fifth Circuit went the other way and came up with a test to put the burden on the state. The district court put the burden on the state. I submit that given the delay and the fact of this case, arguably the burden should be on petitioner. Certainly the burden of establishing a conflict is on him. Well, that was a non-entry. Once the evidentiary hearing is convened, you, I think quite properly, threw in the towel on the existence of the dual representation. I mean, that's not a disputed fact here. Right? Oh, no, Your Honor. It wasn't proven until the hearing. Are you telling us today that it was Morris' obligation to prove that he did not waive the conflict? Yes. On collateral attack, it should be. Now, once again, there's very little law on this. I mean, there are two Supreme Court cases dealing with uncounseled situations, not a conflict. The Fifth Circuit test puts the burden on the state. If the burden is on the state, I submit that we still met the burden. But if the burden is on petitioner, he clearly didn't meet his burden. All right. Well, I apologize. I interrupted. You were about to explain to us why, assuming there is a conflict, why it didn't make a difference. Correct, Your Honor. To prove a conflict claim and the burden is on petitioners to do so, the defendant who raised no objection at trial, and that's the case here, must show that an actual conflict of interest adversely affected counsel's performance. Now, while he did not show, the defendant did not show that the conflict affected the outcome of trial, he must show that the conflict caused counsel to choose a course of action adverse to his interest. Now, here trial counsel's unrebutted testimony established that counsel did not pursue the defense strategy of blaming Artie Morris for the murder because Morris didn't want him to. In other words, petitioner didn't want him to. I'll refer to Kelvin Morris as petitioner so as not to be confusing. Not because of any conflict of interest. Now, the district court erred in concluding that counsel's unrebutted testimony, that the court found that Morris didn't want to pursue a strategy that implicated his brother and demanded that he avoid implicating Artie. Despite those findings, the court found that that didn't warrant reconsideration of its prior determination before holding the evidentiary hearing in which the court concluded that an actual conflict of interest adversely affected counsel's performance. Now, trial counsel's testimony completely refutes the court's prior legal conclusion. I would also point out that counsel's testimony in this regard is corroborated both by Morris' delay in bringing the conflict claim until after his brother died as well as the trial record itself. Just so we can be clear, you concede that a plausible defense would have been to call Artie, right? To call Artie or to call a witness to say that Artie was the shooter? I'm talking about a trial. A trial. A trial. Do you concede that a plausible defense – I'm trying to look at – Certainly, Your Honor. Gambino and our other precedent. Yes. I'm trying to analyze this issue. One prong of that is would this have been a plausible defense causing – Certainly. Okay. Thank you. And I'll get to that. I just was noting that Petitioner was colloquy at trial, and he indicated that much of what was done was done at his behest, and he was very happy with his attorney. In any event, the Artie did it defense. It was not a viable defense strategy at the time of trial. Now, calling Artie Morris as a witness was a very dangerous thing, because Artie in his statements had said that, as well as his girlfriend had said, and, in fact, the girlfriend has never recanted this aspect of her testimony, that Petitioner came to them after the shooting and said that he was in trouble for shooting a white boy, and Petitioner then fled. So Artie was a real problem, as was the girlfriend. And as far as calling this one witness who first identified Artie in an array of photos and then when shown a second array a few days later with Petitioner said that, well, maybe he looked like him, but I still think it was the first identification was correct. Well, the danger of that, as counsel testified, was that seeing Petitioner in the flash, there was a risk that he might identify him or on cross-examination concede that he looked like the shooter. And that could possibly turn into a third idea. Well, couldn't defense counsel have talked to Flowers about that? Well, that's a good question. Would not, if you were the defense lawyer, wouldn't you want to sit down with Flowers and start showing him some pictures and deciding whether you want to call him as a witness or not? Why should we assume that there was some likelihood that Flowers would change? He was twice asked, and he twice said it was Artie, and the only hedge was, well, number six and number seven looks like it could be him, but I still think it's Artie. Well, prior to Mr. Tucker representing Petitioner, he was represented by another attorney, Suzanne Urkel, and a line-up was ordered. And one of the people that was supposed to view the line-up was Flowers. But Petitioner refused to participate in the line-up, and the line-up was counsel. So there was no way for counsel to know what Flowers would do if he actually saw Petitioner in the flash. And also, I believe Flowers – Which is why, again, I don't know, this is evocative of your last argument, it seems to me. There's ambiguity here. We don't know. There's an absence of proof. We don't know whether Flowers would have fingered Artie as he had in the past. We don't know whether Flowers would have switched gears at trial and said, Actually, it's not the guy on the witness stand, or it's not the guy you're showing me a picture of. It's the guy sitting at counsel's table. We don't know what he would have said. Isn't that the problem here? Well, no one knows. But the danger of a possible idea or of a possible, well, it could be him, was something that most trial attorneys, I think, would steer away from. And there was a lot of other evidence pointing to Petitioner, and another idea would have been very harmful. Also, Flowers has never been proven to be available. He never appeared in any of the post-conviction proceedings. No affidavit was ever presented by him until 2004. And no other attorney apparently interviewed him. Let me ask you one hopefully clarifying question. The district court found as a fact that the counsel's conduct was explainable only as it reflected an, quote, impulse to protect Artie. In its opinion, it, as you acknowledge, the court found as a fact also that Kelvin told Artie not to finger, I mean, told his counsel not to finger Artie. Now, what is your, oh, and on the same page, or one sentence later, after the court acknowledges that this instruction was given, the court says nothing came out of the hearing that caused me to re-evaluate what I had previously found was an actual conflict of interest. Now, what is your explanation for how those go together? We've got a rational judge here, I believe. How do you, is your explanation that he made a mistake of law, he didn't realize that there had to be an adverse impact in order for there to be a conflict of interest? Yes, Your Honor, my position is that it is an error of law when the failure to pursue a certain strategy is clearly explained by something other than a conflict, even assuming the strategy is viable. And I have an argument that it isn't, but assuming it's viable, if the record explains it clearly and the reason why a certain strategy isn't pursued is some reason other than the conflict, petitioner loses. And for whatever reason, the district court seems to fail to appreciate that. But we know that the district court correctly understood the law when he was summarizing what he had found in the first opinion. He said, consequently, assuming that an attorney-client relationship existed between the defense counsel and Artie, petitioner is able to establish that a conflict existed and that it adversely affected his counsel's performance. So he knew the law correctly. That's correct, Judge Chapleton, and I can explain it, except that the evidence that was revealed at the hearing clearly indicates that there's another explanation for why the strategy wasn't employed, and it's not related to the conflict. Right after the district court said that, it went to great lengths and numerous pages to explain why the court was finding that there was no waiver. Correct. And I'm wondering whether the court did not think that the instruction of Kelvin to his counsel did not cause him to reevaluate his finding that an actual conflict existed because counsel had not fulfilled his responsibility to put Kelvin in a position to know what his best interest was and therefore we don't know, simply because he instructed his counsel, not to finger Artie, doesn't suggest that counsel has done its duty and this is a situation involving a confluence of interests rather than a conflict. In other words, isn't it possible that the district court thought that he didn't need to change his actual conflict determination for the same reasons that he found that there was no waiver because counsel did not explain to Kelvin? That's possible, Your Honor. The court did not say that. But certainly a defense strategy, I mean, this was Petitioner's brother, and it's quite possible that Petitioner didn't want to employ that strategy because he knew he was guilty and he didn't want to, you know, implicate his brother in a crime that he committed. The evidence against Petitioner was overwhelming. I mean, there was very little suggesting that anyone committed this crime other than Petitioner. Petitioner confessed to two people, a police officer as well as another man. Two witnesses unequivocally identified him. The police sketch that was prepared before either brother was a suspect looks strikingly like Petitioner and has no glasses and Petitioner's brother wears glasses. So given the overwhelming, and Petitioner was the person who fled, Petitioner, the evidence overwhelming established that it was Petitioner who committed this crime, not his brother. And I think because the conflict is explained by something other than, or rather the strategy is explained by something other than the conflict, Petitioner failed to meet his burden. Thank you, counsel. Thank you, Your Honor. Thank you. Good morning. Good morning. My name is Stuart Lev. With me is Billy Nolas and Andrew Harris, and we're here on behalf of Appalachian Kelvin Morris. Before I begin, let me just thank the court for its courtesy in rescheduling the argument for today and taking my schedule into account. I'm deeply appreciative of that. Let me start where the Commonwealth's argument ended, if I can, and with Judge Stapleton's questions about what are we to infer from the fact that Judge Rodriguez heard the entire evidentiary hearing, heard Mr. Tucker testify, heard Mr. Tucker say that he explained the joint representation to the defendant. The defendant didn't want, in Mr. Tucker's words, to implicate Artie because he was protective of him. But that didn't change Judge Rodriguez's decision that this was an actual conflict of interest that affected, that negatively affected the defense, the preparation, the presentation of the defense. And I think, Judge Stapleton, your suggestion is certainly a possible and correct one that Judge Rodriguez was taking on his finding that there had been no waiver, no valid waiver, no full explanation of the nature of the conflict of the defense in this case. But there's also another explanation as well, and I think that runs through Judge Rodriguez's opinion as well, is that he really didn't credit Judge Tucker's testimony in regard to what he told Kelvin Morris and to this allegation that Kelvin didn't want to raise the defense. Although Judge Rodriguez is very courteous, Judge Tucker is a sitting Philadelphia judge and he's very careful in his language, Judge Rodriguez mentions at several points that issues of credibility in this case were strained by the passage of time and by self-preservation interests. Clearly, Judge Rodriguez recognized that there are certain amounts of ethical concerns and self-preservation interests that may be motivating Judge Tucker's testimony in this regard. Judge Tucker made it clear that it wasn't just the lost file that was the basis of this finding, but it was based on what he heard from Judge Tucker and what he credited. Judge Rodriguez's findings of fact are to be reviewed by this court under the clearly erroneous standard. The findings that Judge Stapleton mentioned, the findings he makes from the hearing about the reasons for, about the actuality of the conflict and its impact and the reasons for not pursuing this defense are fact findings that are subject to the clearly erroneous standard. And here, we know he properly applied the law and his findings are supported by the record. Judge Rodriguez's conclusions that Judge Tucker didn't really recognize the full impact of this defense because he said if he had thought blaming Artie, putting this case on Artie, was a plausible strategy, he wouldn't have represented both. But he did. He represented both, and not only did he represent both, he did so without ever advising the district court of the conflict in bringing this matter to a head. This is actually true, but what's the significance of it? Is there, I don't think you pointed to a rule where you must do that. It's significant, I think, in this way, Judge Chigaris. It is not a cause for automatic reversal. I'm not saying here because he didn't do that that establishes a constitutional violation, but I think it's a significant factual issue that goes to Judge Tucker's motivations and what he was doing. And I think, in my mind, it runs like this. Either Judge Tucker knew this was a significant conflict and hid it from the court, and if he did that, if he was deliberately hiding it from the court, then I think it's fair to infer that he didn't fully explain it to his client either. Or I think, as Judge Rodriguez found, he didn't really recognize the impact of this conflict and the significance of this conflict, and therefore didn't see the reason for finding it to the court. I think the fact that he didn't report this to the court and seek the court's assistance in establishing some kind of waiver shows that he never really understood the full impact of this conflict. I think another thing Judge Rodriguez points out from Wheaton v. the United States, that the Supreme Court pointed out, is this idea that the conflicted lawyer is in a position to fully explain the conflict and the impact of the competing defenses to his clients. It's really a very difficult concept. The lawyer has conflicting interests. He's defending Kelvin, but he wants to keep Ardy as a client. He has a financial interest in Ardy's case. He's on a contingency fee agreement. And so how can we assume that the conflicted lawyer is able to fully explain that conflict and fully explain to Kelvin, as I think any reasonable criminal defense lawyer would have done, that blaming Ardy is really a very, very helpful defense in this case. Remember, as a defense, you only have to show a reasonable doubt. Steve. The job of the defense here is to raise a reasonable doubt as to whether it was Kelvin Morris who committed this crime. A reasonable doubt can be raised by saying maybe to the jury, can you be sure, can you be sure it was not Kelvin but Ardy. Having another person there to explain misidentification is an incredibly powerful tool for the defense. Identification, trying identification cases is hard because you have to explain to the jury why the witnesses are making a mistake. Here that explanation is easy. The witnesses are making a mistake because it was Ardy who does look like Kelvin but has some distinct characteristics. Ardy has a glass eye. Ronald Johnson, one of the witnesses who identified Kelvin, drew a composite sketch before his identification that showed the person with the drooping right eye. Any reasonable defense attorney is going to link on that. You have William Lineberry, the other eyewitness who first ID'd Ardy, and then you have another eyewitness who draws a composite sketch that, yes, may look something like Kelvin, but really resembles Ardy because of that drooping right eye. And you link them together and you say, here's the person who did that, and you investigate that. And I think, I forget which of your honors raised the point. I think it was you, Judge Hardiman, raised the point about investigation and would he have gone to talk to Flowers, and certainly that's what he should have done. And, in fact, we at the evidentiary hearing before Judge Rodriguez submitted an affidavit from Flowers that said not only had no one ever come to talk to him and had he identified Ardy twice, but that the police had brought him into the courtroom at another occasion when Kelvin was in there to ask him if that was the person. And he said, no, it wasn't. So if counsel had done his proper investigation of Flowers, he would have learned that this speculation from the Commonwealth that maybe Flowers would have identified somebody else. And, of course, the possibility of a witness going south on a defense lawyer or a prosecutor always exists. It's a matter of speculation and possibility. But he would have had a firm basis to know. Was the failure to call Flowers ever the subject of one of the problems? This has a long procedural history. Has this only been raised recently, or was this part of the ineffectiveness that counsel claims originally brought? It was raised for the first time by Mr. Morris in post-verdict motions immediately after trial, where immediately after trial he raised a claim of ineffective assistance on Mr. Tucker for not calling Joseph Flowers, which not only starts that issue running, but cuts against the idea that he didn't want to blame Ardy. But that was adjudicated, though, right? It was not. It was adjudicated without having an evidentiary hearing in the matter. The post-verdict motions got continued a few times, but ultimately it ended up before Judge Sabo. And counsel had come in after it had been continued for counsel at that time to find Mr. Flowers, and counsel came in and said, I've located Mr. Flowers. He's in the Philadelphia Detention Center. He was incarcerated in the Philadelphia jail. We can bring him in and put him on. And Judge Sabo said, no, I don't need to hear from him. I'm denying your motion for a new trial without hearing from him. It was then appealed on direct appeal to the Pennsylvania Supreme Court, who dismissed it summarily, personally, that said we've reviewed the claims of ineffective assistance and find them without merit. Again, without any kind of thoughtfulness or remand for a hearing. It was raised again in the first PCRA, and it was denied as previously litigated without a hearing. And then it was raised again in our second PCRA, where it was denied again as part of our ineffectiveness claim. So the ineffectiveness claim as to Flowers has been in existence since immediately after the trial in this case, first raised by Mr. Morris. Which stands in striking contrast to the conflict claim. It does. As I understand it was raised for the first time in the second PCRA petition filed on December 30, 1996. Is that right? That's correct. Thirteen years after the conviction. That's correct. How in the world could something raised 13 years after the conviction, when we're not talking about the discovery of new evidence, be viewed as diligent? I think for these reasons. I have a number of answers to that question, Judge Hartman. One is because Pennsylvania law allowed it at that time. Remember, back in that period, Pennsylvania law was such that in case after case, Pennsylvania courts applied a relaxed waiver rule in capital cases. They allowed successor PCRAs. They allowed claims to be raised that weren't raised before. They heard them on the merits. When we raised this claim in 1996, after the first PCRA had been denied by the Supreme Court, a relaxed waiver was still the rule, even on PCRAs. Relaxed waiver wasn't eliminated as part of Pennsylvania Supreme Court practice and PCRA litigation until November of 1998 when they decided the Albrecht case. When they decided the Albrecht case, it was immediately applied retroactively to all the other cases that were pending. No more relaxed waiver. There was no grace period. There was no opportunity to comply with the prior law, to fulfill, to reinvigorate those rights, to have a chance to preserve those issues. It was just applied back then. But why? That's a good answer, but I'm not sure it gets you to the finish line because why does the Pennsylvania relaxed waiver rule control 2254E2, which is a principle of federal statutory law? That's correct. It does because of this. The first that failed to develop PROM, the 2254E2, was a codification of pre-EDPA law, of the Supreme Court's decision in Keeney v. Tamayo-Reyes. And we know that because the Supreme Court said so in Michael Williams v. Taylor. They said 2254E2, the first part, codifies Keeney. And this court has accepted that, and Wilson accepted that, and Kristen B. Brennan, that it's a codification of Keeney. Now, Keeney and pre-EDPA law said, you can't come into federal court with new facts that haven't been developed in state court. And what we're going to do is we're going to – And the point, if I could just interject, the point, I assume, you educate me, is you've got to give the state court system the first crack at it, right? That's right. You don't bypass the state system to come to federal court, right? That's right. That's right. And what Keeney said is we're going to apply the same kind of default rules that we apply to claims to facts. So just like we can't bring an unexhausted claim into federal court unless we meet certain rules, we can't bring unexhausted facts into federal court unless we meet certain rules. And so those rules are that the procedural bar that the state court applies has to be an adequate and independent bar. And then if it is, then the petitioner has the opportunity to show cause and prejudice. All right. So are you now conflating or saying that the adequate and independent state ground doctrine is coextensive with the diligence requirement of 2254E2? Yes. Yes. All right. So then we need to disagree with the Seventh Circuit's decision in Burris in order to find your way here. I think what you need to disagree with is the dicta in the Seventh Circuit's opinion in Burris because their description of 2254E2 in Keeney is purely dicta because in the end in Burris, the Seventh Circuit said this is an interesting question but we don't have to reach it because we don't think 2254E2 even applies to this case. And they ended up making their decision on the basis of pre-EDCO law. So there's the Burris dicta. All right. But when you say the Burris dicta, the language quoted at page 34 of the Commonwealth's brief, section 2254E2 is a rule of federal law liberated from the independent and adequate state grounds doctrine. You're saying that's dicta and it's wrong. That's correct. And I would point out to you that no other court has adopted that, that the courts and there's a footnote in our brief. I forget which footnote or page it's on where we cite to the cases not only Wilson in this court and Judge Smith when he was sitting as a district court judge reached the same conclusion in Purcell v. Horn but there's a footnote with a listing of cases from other circuits, both pre- and post-EDCO that apply the procedural default rule to the 2254E2 question. I'm sorry. Just one more. I guess what's still confusing me a little bit you might help me with is if the record must be made in the manner required by state law and your prior answer to me was it wasn't too late despite this fairly extensive delay. It was not too late because state law allowed it I think were your words. Well, if state law allowed it, why did the state courts say no, you're way too late here? Because they changed the rules. They changed the relaxed waiver rule two years after we filed this claim and then applied that retroactively. They passed a statute of limitations that they then applied retroactively. And the state system is not entitled to do that? They are entitled to do that but that makes it an inadequate default where you haven't had the chance to comply with the new rule. Where you apply a new rule, that's what adequacy is all about. Was it a rule that was firmly established? That renders it inadequate but how does it render counsel, your five or six predecessor counsels not raising the claim that you have so adroitly raised here? I guess what's troubling to me about this case is every one of your predecessors should have done what you did here. I agree with that. I agree with that. They should have done that. Doesn't that mean we're in the next round of ineffective assistance of counsel analysis? No. Because every one of your predecessors were ineffective. They had what appears to be a colorable, perhaps more than colorable, argument regarding this dual representation that that presented a conflict of interest that deprived your client of a fair trial, yet none of them raised it. I agree with that. None of them raised it. And if they had done the kind of investigation that they should have done and had been the kinds of lawyers they should have been, they should have raised it. But under Pennsylvania law, and if Pennsylvania law at the time said, if you don't raise it the, you know, the first time on appeal or the first time they enforced bars at that time, I'd be in a different position here today. But Pennsylvania didn't enforce bars. Pennsylvania applied relaxed waiver up until 1998 so that it was still possible to raise these claims at a later point in the proceedings and have them heard. And that was possible up until, as this court has found in Braunstein and Albrecht and Laird and all of its procedural default cases, and I think there are up to like 11 or 12 of them at this point, said that there was a change of law, 1998 with Albrecht, and that when you apply that new law to a case to a thing that was filed years before it, to a waiver that occurred a year before it, that's inadequate. And that's Judge Stapleton started off the argument today by reading the holding in Wilson. That's the holding in Wilson. And that holding is consistent with the circuits who have addressed this issue. It's consistent with pre-EDPA law. It's consistent with what the U.S. Supreme Court has said about what 2254E2 means. Wilson just seems so factually different because the McMantate was not available. That claim was seasonably raised after the McMantate came to light, was it not? Wilson is factually different, but the language of the rule that Wilson applies is a broader rule, and it's a rule that applies here, and it's the same rule that Judge Smith applied in Purcell v. Horn, where Purcell v. Horn was an ineffective assistance of counsel at the penalty phase proceeding. So it was all investigation and evidence and mitigation that could have been presented by counsel the first time. So how does our Taylor case bear in your argument, then? I'm glad you pointed me to get to that. Taylor is different. Taylor is a situation where at a first PCRA, Taylor involved the question of competency, the defendant's competency to stand trial and to plead guilty. And at the first PCRA, there was a hearing in state court, and the competency issue was at issue. The competency question was at issue. So the defendant had an opportunity in state court to present his evidence and didn't present it at that first hearing. Then defendant files a second PCRA and raises the competency issue again, and this time proffers evidence in support of it and asks for an evidentiary hearing. And the state court denies it, and this court said that Taylor is different from Wilson because in Taylor, this isn't a case where the issue was raised for the first time in the second petition, the defendant never had an opportunity to present this evidence to the state court. In Taylor, the defendant had a PCRA hearing where the issue was joined and had the opportunity to present the evidence in state court and didn't, and then comes back at a later time. That's a very different factual situation than what we have here where Mr. Morris never had the chance to present this evidence to the state courts. The state courts wouldn't hear it. He had 11 years' worth of chances before he finally raised it. Before he finally raised it. That's true. I can't, the time is the time. I can't contest that, Judge Hardiman. But Pennsylvania law, when he first raised it, allowed him to raise it at that time, and then the rules were changed. And that's what makes this case different. So really this case is this very sui generis convergence of EDPA and Albrecht's retroactive application. Is that really what this comes down to when we're talking about the first issue? It does, I think. And that's because that first clause of 2254E2 is there to, as you said, it's there to provide comity to the state. It's based on what state law is and what the state procedures are. So I think, I do want to point out, if I may, about the hearing, though. Finally, the issue that Judge Rodriguez granted the hearing on was only, in his first opinion, the only issue at the hearing was on the question of what was the nature of the representation between Judge Tucker and Artie at the time he was representing Kelvin. And that was allegations that were never contested by the Commonwealth. We had presented evidence to state court, the letters that Judge Tucker had written on Artie's behalf as his lawyer and Artie's testimony at a deposition that after he was injured and got out of the hospital, he had called the lawyer, called Mr. Tucker to represent him, as evidence to show that there was an attorney-client relationship between Artie and Mr. Tucker at the same time that he was representing Kelvin. And the Commonwealth never contested that. They've made other arguments about our procedural rights to bring this case and about whether there really was a plausible alternative strategy, but they've never contested this. Judge Rodriguez granted a hearing on factual issues that really weren't in contest, and he did it for the benefit of being fair and making sure that he was making an accurate decision and giving the Commonwealth the chance, and then the Commonwealth comes into the hearing. Well, but he did also say, though, relief cannot be granted without further development of the evidentiary basis. From what you're saying, you're saying it's sort of just giving him a chance. It seems to me that this is pretty clear. He said he needed to hear it before he granted relief. He felt he needed to hear it, but I would have argued to you that he didn't because it wasn't a contested fact. It wasn't anything that the Commonwealth ever contested in any of his pleadings or raised any question about our allegations that there was joint representation, there was simultaneous representation going on here. But I think it was proper for, he didn't have to hold the hearing, but it was certainly proper for him to do so. It was proper under 2254E2. I think he held the hearing. He heard the testimony. He made credibility findings. He made findings of fact. Those are clear error, to be reviewed by clear error. Tell us again. He found as a fact that Kelvin told his counsel he didn't want to pursue. All right. Now, why does that just in itself not make this a case of confluence of interests rather than a conflict of interests? Well, a couple of answers. If he didn't want to do that, if he didn't want to blame it on his brother, then counsel said, okay, it's your trial, your life. I don't read Judge Rodriguez's opinion as finding as a matter of fact that Kelvin said he wanted to not blame Artie. I read particularly footnote six in Judge Rodriguez's opinion as recognizing that that's what Mr. Tucker testified to. And I believe that Judge Rodriguez didn't credit that testimony. The Commonwealth elicited testimony that trial counsel did not perceive the misidentification strategy as viable, and he justified his employee strategy. In addition, he stated that petitioner did not want to pursue a strategy that implicated his brother. Now, I admit that's a bit what he said was he would not have wanted. But the court apparently found that he instructed counsel. Now, why is that not the end of any claim of conflict of interest? Well, two answers. Again, I think what you just read there, Judge Stapleton, is Judge Rodriguez's account of Mr. Tucker's testimony, not as findings of fact. But even if they are his findings of fact, I think it comes back to the question of waiver, as you raised during my adversary's argument, that how could Kelvin be entrusted with this decision of deciding, you know, not to raise his defense if it's not – if the benefits of the defense and the importance of the defense are not adequately explained to him. And Judge Rodriguez clearly found whether the burden of proof – Judge Rodriguez did find that the burden of proof is on the Commonwealth, and he distinguished the cases the Commonwealth cites, and I think he did so properly. But he also notes right there that even if the burden of proof were on the defendant, were on Mr. Mars, that Mr. Mars satisfied that burden of proof by showing that he did not receive a full explanation of the conflict. So certainly any decision Mr. Mars – any opinion Mr. Mars would voice would not be a very informed one if he didn't understand the importance and the value of the defense. Also, in the end, the choice of defenses is counsel's. That's not one of the issues that goes – that we entrust to the defendant, particularly Kelvin Mars, a defendant with a 69 IQ with a history of mental illness and psychiatric hospitalizations. And Mr. Tucker in his testimony agreed. Ultimately, it was his decision which defenses to make. He may take into account the opinion. I'm sorry, Judge. What do you cite for the proposition that a decision of that kind is the responsibility of counsel? I think this court's opinion in United States v. Gray, which is cited in a footnote in our brief, I think, for another proposition. I think this is not cited in our brief, but the U.S. Supreme Court in Florida v. Nixon within the last couple of years laid out the kinds of decisions entrusted to the defendant and the kinds entrusted to counsel. And the issue of what witnesses to call and what arguments to make to the jury is clearly the kinds of decisions that we entrust to counsel. Nixon's a case where the defense lawyer got up and admitted his client was guilty in order to lay a foundation for the penalty phase. In a harm or death case. That's right. The Supreme Court said that was okay. Yeah, the Supreme Court said that was okay, reversing the Florida court, as I remember, that said that wasn't okay. And you have to remember that even on the evidence, and I think Judge Rodriguez points this out very clearly, that even on the evidence that was presented at trial, there was a significant argument to be made to the jury that the real perpetrator was Artie, and it's a reasonable doubt to be raised. And Mr. Tucker, in his closing argument, never did that. It's sitting right in front of him, and he never did it. He didn't investigate. He didn't call attention to the closeness of the composite sketch. He didn't call attention to Lineberry's identification of Artie. He never suggested to the jury that Artie Morris was the real doer, because he was representing Artie and had a financial interest in Artie's civil case. This is a gross conflict. It really is a gross conflict. And I think we all know that ethically, it's a real question as to what happened. And as you pointed out, the law is not different today than it was back in 1982 and 83. The ethical rules applying in this case, the requirements of counsel for disclosure, are still the same. And this is a case where this conflict really affected, we can see, really affected the kind of investigation that was done and the defense that was presented. And Judge Rodriguez made appropriate findings. They're not clearly erroneous. His conclusions of law are correct. I just had one more question, sort of a side note. Could you update us on your client's third PCRA petition, the Atkins claim? The Atkins claim was dismissed as moot. When, in addition to granting the new trial that's on appeal here, Judge Rodriguez granted a new sentencing because of ineffective assistance of counsel at the penalty phase proceeding. When the Commonwealth didn't appeal that, then Judge Jeroff and the Court of Common Pleas dismissed the Atkins claim as moot because should this case ever come back for a new penalty hearing or a new trial, the Atkins issue can be litigated then. I'm content. Thank you, counsel. Thank you very much, Your Honor. Your rebuttal. Initially, I'd like to note that the district court seemed to feel that the Commonwealth had not contested the existence of dual representation. I don't know whether it's because this case was sent to the District of New Jersey. Maybe they plead differently there. But we routinely do not do detailed pleading, admitted, denied. We generally don't admit anything unless we say we concede it. We never conceded this. We demanded proof of this. We claimed the petitioner was not entitled to any relief based on this claim and also that he was not entitled to a hearing on the claim. The issue of dual representation was not conceded. It was contested. Moreover, petitioner has the burden on the conflict claim ultimately. In proving adverse effect, it is his burden. Based on counsel's testimony at the hearing, it was incumbent upon petitioner to get on the stand and say, I didn't tell my lawyer that. Or, you know, he told me that and, yeah, I did say that, but, you know, I didn't really understand it. Nothing. Nothing from petitioner. I would also point out the timing of the raising of the conflict claim is very significant. Counsel here said that it was raised in December of 1996. Artie Morris died November 2, 1996, of a drug overdose. I submit that we would not be hearing a conflict claim now if Artie Morris hadn't died. Another thing I would like to point out. So, in other words, it's not crystal clear. You don't necessarily agree with Mr. Lev's statement that his predecessors were all ineffective. There's a possibility that the client did not release those lawyers to make this argument until his brother was in the grave. Most definitely, Your Honor. I mean, there's no question that the prior lawyers could have learned about the possible conflict claim and raised it previously since, you know, petitioner as well as his whole family knew about it. Even without Kelvin's consent, they still could have invested. They could have learned that on their own. They could have learned from his mother, possibly a family, or from interviewing petitioner himself. I mean, it certainly was available. But it is quite possible, as Your Honor points out, that petitioner said, no, I don't want you to raise this. It's going to hurt my brother. And, you know, perhaps it's because he knows his brother didn't do it. But in any event, that's the factual framework. Now, the main thing that I get the impression the panel is concerned about is not calling Joseph Flowers as a witness at trial to say, I still think my first idea was right and I think it was really this other guy. Well, first of all, Kelvin and Artie look a lot alike, a great deal. In fact, all the Morris brothers look a lot alike. So I know when the claim was raised in the Pennsylvania Supreme Court the second time on first PCRA review, the court said, well, you know, I can't show prejudice that he was harmed in any way because they look so much alike. It's not very helpful to say that I think it's this guy and he looks just like the guy who's on trial. The defense that counsel presented was one of mis-idea. He put two witnesses on the stand to say that they sold the shooter and the shooter was darker and taller than petitioner. Now, petitioner and Artie Morris are the same complexion, same height, look a lot alike. So putting a witness on to say I think it's this other guy who looks sort of like the defendant anyway would have actually cut against the defense presented. I would also point out that this court has held that when there is no conflict of interest where the police already have the evidence that the conflicted attorney is alleged to have failed to present because of the conflict, United States v. Morelli, United States v. Gambino, they're both cited I believe in our brief as well as our reply brief. And here the police knew full well that Joseph Flowers originally said it was Artie and then said, well, you know, I think it could be this other guy, which is the petitioner, but, you know, I still kind of think my first idea was right. Commonwealth knew about that. Commonwealth knew about all the evidence that counsel is alleged to have not presented because it would have hurt Artie. The fact of the matter is it wouldn't have hurt Artie at all to put this evidence on, but counsel didn't put it on and we now know it's because petitioner didn't want him to. And petitioner has never been found incompetent. He admittedly has a low IQ, but every doctor who examined him around the time of trial, prior to trial and after trial, found him competent and able to assist in his defense. And that is all required to be tried and to give input to their attorney as to how they want the case to proceed. Didn't the trial court, didn't the district court find as a fact that counsel didn't want to alienate a client with a claim that could produce an award to both himself and to Artie? The court, Your Honor, found that before the hearing. I would point out that counsel's testimony refuted that because counsel said that he would not have favored Artie over Kelvin. He also indicated that Artie wanted him to continue to represent him, even if he presented evidence indicating that Artie was the shooter. So the court thought, prior to hearing counsel's testimony, was in fact refuted by the testimony. But moreover, given that petitioner didn't want this defense presented, there really was no conflict, penal or financial. And that would be my response to that. What about Mr. Love's arguments regarding the propriety of the evidentiary? I don't think anything that he said made a difference. I think this court's decisions in Taylor, as well as Lewis and Boyd, support the notion that diligence under 2254E2 is separate and apart from the whole default analysis and adequacy of state procedural rules. There's a requirement to be diligent. And most recently, the Lewis decision defaulted claims. Defaults found to be inadequate. The state rule was found inadequate. And this court nonetheless said that the petitioner failed to adequately develop the claim in state court and a hearing would be barred under 2254E2. And I think that's clear. Well, what about his point that the first clause incorporated state law, but for the retroactive application of Albrechts? Maybe your argument would be you would have to concede that perhaps, but for the retroactive application of Albrechts. Well, Albrechts ended the custom of a relaxed waiver in capital cases in Pennsylvania. But the default here actually has nothing to do with relaxed waiver. It's the PCRA time bar. And that time bar is very clear. The state courts have never failed to not enforce that provision. So it's a bit different than relaxed waiver. But certainly, the state court requires a petitioner to do certain things to get an evidentiary hearing. It's discussed in Lewis. It's discussed in the dissent by Your Honor and Judge Shigaris and Boyd. But Boyd wasn't an adequate independent state ground case, though. No, it wasn't. But Lewis had a claim, and there was one claim that was defaulted in state court. This court found the default inadequate and nonetheless found that the petitioner was barred from having an evidentiary hearing because the claim had not been developed in state court. So I guess my argument is that diligence under 2254E2 is something separate and apart from adequacy of state rules. I mean, certainly, as I think Your Honor noted, the petitioner had many opportunities to raise this claim in state court. He could have raised it in post-critic motions. He could have raised it on appeal. He could have raised it in his first PCRA. And he didn't do so, and he had a series of attorneys. He raised it in his second PCRA. Second. So you're saying he didn't seek an evidentiary hearing in support of that claim? He requested an evidentiary hearing in the PCRA petition in a conclusory fashion. The only evidence he proffered in support of the claim were the two letters written by counsel about medical records with respect to Artie Morris and a couple of pages of a deposition. The letters were prior to the trial. The deposition was like a year after the trial. Are you talking about the first petition or the second? This is the second petition. That was the proffer. Well, that void, at least my view in void, does have some applicability to that in the sense that it's not enough just to say to the state court, I would really like an evidentiary hearing. Please give me one. You need to put forward some evidence that would put the state court on notice that there ought to be an evidentiary hearing. And you're saying that wasn't done here? It wasn't. A specific argument in the PCRA petition was not made as to why it was imperative that a hearing be held in order to prove the conflict claim. On appeal from the denial of PCRA relief, a hearing was requested in the body of the argument dealing with conflict, but the argument still was I'm entitled to relief. At a minimum, I'm entitled to a hearing. But, of course, this is on appeal. When you have a major proffer and you haven't developed it in the lower court, the appellate court in Pennsylvania is generally unlikely to grant a hearing at that point if an adequate proffer wasn't made below. But, moreover, there's a requirement of diligence, and this is not a situation where a petitioner first learned about the conflict. I pointed out a case in our reply brief, Schluter, a decision by this court, and that dealt with a petitioner who was time-barred, and he was trying to establish that it was a new conflict claim that couldn't have been raised previously under the AEDPA. And this court concluded,